UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MARK J. DOBBINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. 05-CV-140-B-W |
| POSTMASTER GENERAL AND CEO, | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Mark J. Dobbins filed a civil action against the United States Postal Service, his former employer, contending that his supervisors wrongfully terminated his employment based on discriminatory and/or retaliatory animus harbored against him on account of his alleged disabilities, EEO activity, and FMLA activity. The Postmaster General, the nominal defendant, has filed a motion for summary judgment against all claims. I recommend that the Court deny the motion.

**Statement of Material Facts**

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all evidentiary disputes appropriately generated by the parties' statements have been resolved, for

purposes of summary judgment only, in favor of the non-movant.  Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

Mark Dobbins began working as a technician for the United States Postal Service in the fall of 1975.  (Def.'s Statement of Material Facts (DSMF) ¶ 5, Docket No. 30.)  That same fall, prior to his start date, Dobbins underwent a surgery to repair the meniscus of his left knee.  (Id. ¶¶ 2, 4.)  Over the course of his employment, Dobbins was often required to attend training sessions at the Postal Service's national training center (NTC) in Oklahoma.  (Id. ¶¶ 7, 11, 15, 17, 27, 29, 31, 37, 46, 50, 53, 54, 55, 56, 58.)  The NTC is a "living and learning center" where postal employees will often remain for a period of days and sometimes for a period of weeks.  (Id. ¶ 8.)  The Postal Service pays for the costs associated with the NTC training sessions and postal employees may submit travel vouchers to apply for reimbursement of those personal expenses incurred in order to attend training programs at the NTC.  (Id. ¶¶ 9-10, 32, 38, 47.)

After stints working as a technician in Alaska and Massachusetts, Dobbins obtained a mail carrier position in Brewer, Maine, in 1979.  (Id. ¶¶ 13, 18.)  It appears that he remained in that position until 1994.  During this period Dobbins had a second operation on his left knee to address nightly knee pain he experienced in 1981.  (Id. ¶¶ 19-20.)  In 1994 Dobbins became a building equipment mechanic (BEM) assigned to the Postal Service's Bangor Processing & Distribution Center.  (Id. ¶ 30.)  He attended four training sessions at the NTC that year and he submitted travel vouchers to recoup associated expenses, per diems and travel pay.  (Id. ¶¶ 27, 29, 31, 32, 37, 38, 40.)  Later that year, Dobbins complained that pain in his left knee was interfering with his sleep and he underwent a third knee operation.  (Id. ¶¶ 35-36.)

In 1995, Dobbins submitted a claim for worker's compensation for degenerative arthritis in his left knee, asserting that the condition was caused by his work as a mail carrier and that his

current work as a BEM made his knee unbearable.  (Id. ¶ 42.)  The Postal Service contested the

claim but Dobbins eventually obtained an award of $49,000 from the Department of Labor.  (Id.

¶ 44.)  That year Dobbins attended two training sessions at the NTC and submitted travel

vouchers, including travel expenses, per diems and travel pay.  (Id. ¶¶ 47, 49, 50.)  Over the

course of 1995, Dobbins used between 73 and 110 days of sick leave.  (Id. ¶ 51; Pl.'s Statement

of Material Facts (PSMF) ¶ 51.)

　　　Dobbins attended two more training sessions at the NTC in 1996.  (DSMF ¶¶ 53-54.)

Dobbins attended one more training session at the NTC in each of the years 1997 and 1998.  (Id.

¶¶ 56, 57.)

　　　At some undisclosed point in time, Dobbins began working out of the Postal Service's

Hampden facility.  In March of 1999, Dobbins experienced frustration in the workplace because

his schedule was changed so that he had Mondays and Tuesdays off rather than his accustomed

Sunday-Monday off time.  (Id. ¶ 67.)  The lack of a weekend day off would interfere with

Dobbins's ability to spend time with his wife and children.  (Id. ¶¶ 68-73.)  Dobbins had a

confrontation with his supervisor over the matter and filed a union grievance.  (Id. ¶¶ 70, 76;

PSMF ¶ 76.)  Evidently, emotional upset over this confrontation and other emotional stressors in

Dobbins life led to a period of leave time of over one month.  (DSMF ¶¶ 77, 84; Def.'s Ex. 75.)

In August of 1999 Dobbins submitted a worker's compensation claim for the incident,

contending that he had suffered a stress injury at work.  (DSMF ¶ 86.)  That claim ultimately

failed.  (Id.)  In September of that year Dobbins applied for approval to take family medical

leave on an intermittent basis for a "serious indefinite chronic condition" and his application was

granted.  (Id. ¶ 87.)  Postal Service Attendance Coordinator Loraine Martin approved this

request.  (Id.)  This FMLA leave began on September 22, 1999.  (Id. ¶ 89.)  In November,

Dobbins filed two EEO complaints against his supervisors.  These claims appear to have been an outgrowth of his earlier union grievance over schedule changes and various events that transpired in the workplace as consequences of the new schedule.  Both complaints alleged discrimination in the form of disparate treatment based on religion, age, sex and disability, as well as retaliation for EEO activity.  One complaint concerned primarily matters related to scheduling.  It named Robert Garwacki, Dobbins's maintenance supervisor, as someone who discriminated against him.  The other complaint concerned primarily matters related to leave requests filed by Dobbins in the wake of the schedule change.  (Id. ¶¶ 93-94, 40.)  The latter complaint named Mark Hanscom as one of the officials who allegedly discriminated against Dobbins.  (Id. ¶ 94.)  In 1999 Dobbins used approximately 38 days of sick leave and four days of FMLA leave.  (Id. ¶ 96.)  Dobbins signed a settlement agreement form in February 2000, following some settlement negotiations anent his EEO complaints, but the proposed settlement was rejected by his union representative, who concluded that Dobbins deserved better settlement terms.  The settlement agreement form indicates that the union representative had this authority. (Id. ¶¶ 98, 99; Def.'s Exs. 91 & 92.)

In 2000, Dobbins made three additional FMLA requests, one for a couple of days [1] off in connection with his daughter's broken arm (DSMF ¶ 100; Def.'s Exs. 93 & 94), another claim for intermittent leave associated with  "symptomatic advanced chondromalacia" in his knee, as well as early osteoarthritis, both of which apparently involve painful flare ups and contribute to "situational stress" (DSMF ¶ 102; Def.'s Exs. 95 & 96), and a third for intermittent leave on an indefinite basis for agitation, insomnia and anxiety (situational stress) of unknown duration to address stress spells usually lasting 2-3 days and to account for monthly counseling

---

[1]     The Postal Service mischaracterizes the request as a request "to use 6 to 8 weeks of Family Medical Leave to care for his daughter."  (DSMF ¶ 100.)  The cited records do not support this characterization.

appointments (DSMF ¶ 105; Def.'s Ex. 99).  The Attendance Coordinator approved each of these applications.  (DSMF ¶¶ 101, 103, 106.)  Dobbins continued to sign up for available overtime in 2000.  (Id. ¶¶ 104, 108, 111, 117.)  In August of 2000, Dobbins filed a third EEO complaint against certain supervisors, including Robert Garwacki, but not including Trask or Hanscom. The complaint appears to have been largely an amendment or supplementation of his ongoing EEO activity on the prior complaints, but also included some newer FMLA issues and an issue related to a certain job opening in the 2000 timeframe.  (Id. ¶ 110; Def.'s Ex. 103.)  In October, Dobbins applied for FMLA leave for a one-month period to assist his father at home following a total hip replacement.  (DSMF ¶¶ 114.)  The Attendance Coordinator approved this request.  (Id. ¶ 115.)  In addition to the 15 days Dobbins took off in order to assist his father following the hip replacement, Dobbins took over 320 hours, or approximately 40 days, of FMLA leave in 2000. (Id. ¶ 118; PSMF ¶ 118; Def.'s Ex. 110.)

Dobbins filed a fourth EEO complaint in February 2001, naming Robert Garwacki and Mark Hanscom as supervisors who had discriminated against him.  (DSMF ¶ 120.)  This complaint appears to have reflected a further supplementation of his earlier claims and new alleged wrongs involving EEO and FMLA retaliation.  (Def.'s Ex. 112.)  Dobbins continued to seek overtime in 2001.  (DSMF ¶¶ 119, 122, 126, 132.)  Dobbins attended training in Albany, New York, in November and submitted travel vouchers for mileage, per diems and other training-related expenses.  (Id. ¶¶ 135, 137.)  Over the course of 2001, Dobbins took approximately 20 days of FMLA leave and five days of sick leave.  (Id. ¶ 144.)

From September 2001 until January 2002, Dobbins worked part time at a second job to make some additional money.  (Id. ¶ 147; PSMF ¶ 147.)  Dobbins continued seeking overtime in 2002.  (DSMF ¶¶ 148, 150, 152.)  Dobbins appears to have sought a modification in his

intermittent FMLA leave approval in January of 2002, though the documents cited by the Postal Service in support of such a finding are not competent to establish the particulars of that effort. (Id. ¶ 146.)  On December 6, 2002, Dobbins passed his first kidney stone.  (Id. ¶ 154.)  Because it was extremely painful and he did not know what was happening, he went to the emergency room.  (Id. ¶ 155.)

On March 13, 2003, the Postal Service and Dobbins entered into a settlement agreement and release with respect to the four outstanding EEO complaints, including any and all civil rights, age discrimination, sex discrimination and disability discrimination claims, but not any FMLA claim.  (Id. ¶ 157; Def.'s Ex. 143.)  In April 2003 Dobbins attended training at the NTC and submitted a travel voucher to recover travel costs, per diems and phone calls.  (Id. ¶¶ 159-160.)  Also in April, the Postal Service approved an FMLA leave request submitted by Dobbins that requested intermittent leave of an indefinite duration having a frequency of two-to-three times per month and a duration of four-to-five days for an unspecified chronic condition.  (Id. ¶¶ 162-163.)  This request appears to have wrapped all of Dobbins prior requests into a solitary request.  In other words, rather than submitting different requests for each discrete ailment, this request appears to have combined all of the outstanding health problems:  adjustment disorder, anxiety, insomnia and the chondromalacia of his knee.  (Id. ¶ 162.)[2]  In June, Plant Manager William Hodson issued a memorandum addressing attendance control that reminded employees to seek advance approval for absences, to call in to notify supervisors and to identify the cause for and duration of any absence.  (Id. ¶ 165.)  This memorandum was followed up with a

---

[2]    Dobbins denies making a request because the Postal Service cites only his physician's certification paperwork rather than his actual FMLA leave request.  However, he does not similarly deny the statement that a new FMLA leave application was approved in May 2003.  I fail to discern what disadvantage Dobbins might have if the Court were to find that his 2003 application concerned these particular medical issues, since it is undisputed that he was approved for four-to-five days leave, two-to-three times per month.

workplace talk given by supervisors Michelle Trask and Mark Hanscom, and attended by

Dobbins.  (Id. ¶ 166.)  Dobbins continued seeking overtime in 2003.  (Id. ¶¶ 156, 158, 164.)

      In affidavits associated with his various EEO activity, Dobbins has identified himself as a

disabled individual on account of his knee impairment, "mental illness," stress and anxiety.  He

also indicated that he was being treated for stress and anxiety and for an unspecified "sleep

disorder."  He also indicated that he received FMLA leave in connection with these conditions

and for "insomnia."  (Pl.'s Statement of Additional Material Facts (PSAMF) ¶¶ 2, 5, 6, Docket

No. 47).  Based on these and other representations, including his numerous FMLA requests,

there is a genuine issue of material fact whether Dobbins's supervisors were aware of the fact that

Dobbins had a sleep-related disorder for which he received FMLA leave.  The record will

support a finding that Trask, the supervisor who eventually terminated Dobbins's employment,

understood that he had sleep apnea and that it was related to his FMLA leaves.  (Id. ¶ 14; PSMF

¶ 211; Def.'s Ex. 151 at 25-26, 42.)

      The instant lawsuit is most directly a product of events that transpired between August

and October of 2003.  On August 15, 2003, Dobbins called in to the office and reported that he

was sick, but that he planned to travel to the NTC for training on August 17, as scheduled.

(PSAMF ¶ 16.)  On August 16, 2003, Dobbins requested FMLA leave on Form 3971, which was

signed by Trask on August 18, 2003.  (Id. ¶ 11.)[3]  The form requested FMLA leave for the last

three days that Dobbins was scheduled to work prior to his trip to the NTC, August 13-15.  (Id.

¶¶ 11-12.)  Trask did not believe that Dobbins was really sick on those dates.  (PSAMF ¶ 12.)

Nor did Garwacki.  (Id. ¶ 13.)  On August 17, Dobbins set out to attend training at the NTC.  He

traveled from Bangor to Boston as scheduled.  (DSMF ¶ 175.)  Dobbins's scheduled flight from

---

[3]    The form is cited but it does not appear on the electronic docket.  It is available as plaintiff's exhibit 33 in
the paper file.

Boston to St. Louis was overbooked.  The airline offered a $300 flight coupon to any traveler willing to take a later flight to St. Louis and Dobbins took the offer.  (Id. ¶ 176.)  As a result, Dobbins's travel time to St. Louis was approximately 19 hours rather than 10.  (Id. ¶ 178.)  Upon arriving at the NTC, Dobbins called in to the office to report his arrival.  Because it was after midnight, he had to leave a message.  In his message he indicated that he had an arrival time of 12:37 a.m. (eastern time).  (Id. ¶ 179; PSMF ¶¶ 178-179.)  Trask and Dobbins spoke by phone later that day.  According to Dobbins, Trask only wanted to know whether Dobbins's reported arrival time of 12:37 a.m. was accurate, and he indicated it was.  (PSMF ¶ 184.)  According to Trask, Dobbins told her that he was delayed because a blackout in Boston caused delays. (DSMF ¶ 184.)  Dobbins denies making such a statement.  (PSMF ¶ 184.)  According to Dobbins, the real reason why he delayed his travel and took the coupon was that he experienced another kidney stone while at the Boston airport and was "compelled" to give up his seat for a medical reason.  (Id. ¶ 177.)  It is undisputed that Dobbins did not offer this explanation to Trask on August 18.  (DSMF ¶ 185.)  According to Trask, the reason why Dobbins would have called upon his arrival and indicated his arrival time was to notify her that his arrival time was different from the time indicated on a travel form (form 7020) prepared prior to his departure, in order to claim additional compensation for travel time.  (Id. ¶ 179.)  According to the Postal Service, Dobbins was required to call in, but only if his travel time differed from that indicated on form 7020.  (Id.)  According to Dobbins, he only called in to give notice of his late arrival and Trask unilaterally modified his form to support additional travel compensation.  It appears to be undisputed that Dobbins never actually verbalized any request that his form[4] be modified or that

---

[4]     The Postal Service has not cited to the actual form that was submitted in connection with this scuttlebutt. The only relevant document identified in the record is a travel advance request and itinerary schedule signed by Dobbins on August 6, 2003, requesting an advance of $562.00 to attend training at the NTC.  (Def's. Ex. 152.)

he receive any additional compensation for his travel time, at least not on August 18.  (Id. ¶¶ 178-179; PSMF ¶¶ 178-179.)  The Postal Service intimates otherwise in paragraph 179 of its statement, but neither the wording of the statement nor the sources cited in that paragraph supports a finding that Dobbins affirmatively requested additional travel pay on August 18.  In any event, Dobbins was paid for his extra time and some of that extra time was paid at a penalty, overtime rate.  (DSMF ¶ 178.)  Although Dobbins insists that he never asked to receive additional payment, it has to be noted that he desired to receive such compensation.  After his suspension, Dobbins argued that he was entitled to travel wages for all of his travel time, as described below.

Dobbins cites testimony he gave at a Maine Department of Labor administrative hearing in January 2004, to the effect that Trask had called him for the purpose of asking whether his reported arrival time was correct.  (PSMF ¶ 184, citing Pl.'s Ex. 4 at 57, Docket No. 48.)  Although he cites only page 57 of the transcript, the colloquy runs into page 58, which reads as follows:

> Mr. Dobbins:  And then I went on and explained to her that yeah I had delays because of the blackouts and because of the, of the lightning strike, and troubles in Dallas and I didn't mention the sick leave.  That was, she didn't ask, I didn't mention it and it didn't enter, didn't even enter my mind.

(Pl.'s Ex. 4 at 58.)[5]

Section 8-3.1.2 of the February 2003 edition of the Postal Service's Employee Labor Relations Manual provides that bargaining unit employees may not voluntarily vacate a reserved seat on an overbooked flight.  (DSMF ¶ 181.)  Evidently, a contrary rule was in place at some prior point in time that would permit a bargaining unit employee to voluntarily vacate a reserved

---

[5]     Dobbins recounts the circumstances of his travel on August 17-18 at paragraphs 18 through 24 of his statement of additional material facts (PSAMF).  Evidently, his second flight was delayed by over an hour due to circumstances beyond his control.  (PSAMF ¶ 24.)

seat so long as it did not interfere with his or her duties or result in added expenses for the Postal

Service.  (PSMF ¶ 182.)  There is no indication that Dobbins was aware of either rule as of

August 2003.

Trask made a contemporaneous note of her phone conversation with Dobbins on August

18.  On the note is a marking: "EEO."  Trask indicated during a deposition that she could not

explain the marking on her note.  (PSAMF ¶ 31.)  Trask was aware of Dobbins's EEO activity as

of August 18.  She had heard about it through "hearsay and rumors," but she maintains that she

"did not know for a fact."  (Id. ¶ 32.)  Also on August 18, Trask spoke with another of Dobbins's

supervisors, Mark Hanscom, who told Trask that Dobbins was a difficult employee.  (Id. ¶ 29.)

It appears from documents cited by the parties that Hanscom was a supervisor whose duties

included scheduling.  (See, e.g., Pl's. Ex. 34.)  At some point in time Trask came to be in

possession of a file, provided to her by Hanscom, which Hanscom had labeled "Dobbins EEO

9/10/01."  (PSAMF ¶ 30.)  At her deposition, Trask testified that she came into possession of the

file after she suspended Dobbins's employment.  (Def.'s Reply Statement ¶ 30; Def.'s Ex. 151 at

174.)

After speaking with Dobbins on August 18, Trask changed the arrival time on Dobbins's

Form 7020 to reflect his reported arrival time and she initialed the form.  (PSAMF ¶ 34; Pl.'s Ex.

6A.)  Form 7020 is entitled "Authorized Absence from Workroom Floor."  (Pl.'s Ex. 6A.)  The

form is used to support claims for travel time.  By changing and then initialing the form Trask

understood that she was approving additional pay for Dobbins based on his reported arrival time.

(PSAMF ¶ 35.)  However, after doing so, Trask began an investigation on August 18 by calling

the travel agent used in connection with the flight, the airlines and, ultimately, the Postal

Inspection Service to determine the circumstances surrounding the flight.  (Id. ¶ 37.)  According

to Trask, she believed that Dobbins had committed a criminal act as a result of his conduct in connection with his change in his flight plans.  (Id. ¶ 38.)

Dobbins had an "interim trip home" and then returned to the NTC at some unspecified date to complete the training program.  The Postal Service asserts that Dobbins traveled home for his interim trip a day earlier than scheduled.  (DSMF ¶ 187.)  Dobbins says he traveled on the scheduled day.  (PSMF ¶ 187.)  Whether he traveled on the scheduled day or not, it does not appear that any erroneous entry called for Dobbins to receive more compensation than he was entitled to.  After final completion of the program, Dobbins was scheduled to return from the NTC on September 27, 2003.  Because the program was ending early on September 26, Dobbins made arrangements with the airline to change his travel date to September 26.  (DSMF ¶ 193.) He did not obtain preapproval from his supervisors in Hampden, but the change in his itinerary did not cost the Postal Service any money for Dobbins's travel-related expenses (per diems, mileage, etc.).  (DSMF ¶¶ 191-193; PSMF ¶¶ 191, 194; PSAMF ¶ 51; Def.'s Ex. 12 at 266-67.) The Postal Service fails to properly establish in the summary judgment record the value of any extra wage Dobbins earned by virtue of submitting a claim with a travel date of September 27, rather than September 26.  In an inappropriate reply to its own statement of material facts, specifically paragraphs 195 and 196, the Postal Service offers that September 27 was not one of Dobbins's regularly scheduled work days, whereas September 26 was, so that his rate of hourly compensation would have been set at a premium rate for travel on the 27th, but not for travel on the 26th.  (See also Def.'s Reply to Pl.'s Statement of Additional Facts ¶ 51, Docket No. 52, cross-referencing those inappropriate reply statements).   The cited portions of the record do not establish that Dobbins actually received any such payment.  They do assert that date entries made

on form 1012 (discussed below) would not have been relied upon to support a claim for travel wages, in any event.

On October 9, 2003, Dobbins executed a travel voucher (form 1012) in connection with his August-September training at the NTC.  (DSMF ¶ 200; PSMF ¶¶ 199-200.)  Trask was on duty that day and received the form from Dobbins.  Dobbins had previously asked her for assistance with it, but she failed to provide him with any assistance in filling out the form.  (PSAMF ¶¶ 44-45.)  According to Trask, it was her duty as supervisor only to make a cursory review for mathematical errors before sending it "down to finance."  (PSAMF ¶ 46; Def.'s Ex. 151 at 105.)  Trask knew that some of the dates indicated on the form were wrong, but she made no effort to correct them or to call to Dobbins's attention the fact that he was submitting inaccurate information.  (PSAMF ¶¶ 47-49.)  Form 1012 indicates a travel date for the interim trip home of August 30 rather than August 29, although Dobbins asserts that he was scheduled to travel and did, in fact, travel on August 29.  (DSMF ¶ 202; Def.'s Ex. 158.)  The form also indicates the travel date for his final trip home as September 27.  (Def.'s Ex. 158.)  The form was corrected during the course of a review conducted by the Postal Service's Accounting Services for the District of Maine.  (PSMF ¶ 202; Pl.'s Ex. 12.)  Form 1012 is not used to support claims for compensation for travel time, one of the issues related to Dobbins's prolonged journey to the NTC on August 17-18, 2003, and to his travel home on September 26.  Form 7020 is the relevant form for the hourly wage component of Dobbins's training-related compensation.  It is used by postal employees to record duty performed away from their assigned duty-station.  (Def.'s Reply Statement ¶ 53.)  In other words, an erroneous travel date on form 1012 would not provide documentary support for a claim for travel wages at *any* hourly rate.  Travel wages would be a function of form 7020, which Trask had supervisory control over.

Postal Inspector John Van Morris issued a report on October 29, 2003.  Van Morris found that Dobbins had violated postal regulations by accepting the travel voucher from the airline and not keeping to his original itinerary.  According to Van Morris, Dobbins's original flight arrived on time and Dobbins had, therefore, been untruthful about the reason for his delay.  Van Morris also concluded that Dobbins had "deliberately falsified" his travel voucher because he sought travel-related compensation for August 30 in connection with his interim trip home, though he had actually traveled on August 29.  (DSMF ¶ 203.)  Dobbins asserts that the investigative memorandum issued by Van Morris should be stricken as inadmissible hearsay.  (PSMF ¶ 203.) I do not treat the inspector's findings as establishing the truth of the matters asserted therein, but I recount the findings made by Van Morris to explain what his findings were and how the disciplinary process unfolded.

On October 16, 2003, two weeks prior to the issuance of Van Morris's report, Trask suspended Dobbins pending the completion of the ongoing investigation, citing "inappropriate use of [p]ostal [f]unds."  (PSAMF ¶ 54; DSMF ¶ 204.)  Trask was unaware at that time whether Dobbins had any prior disciplinary record and she had not yet interviewed Dobbins in connection with her disciplinary investigation.  (PSAMF ¶ 57.)  Dobbins notes that, as of October 16, he had not yet received any money as a result of submitting the voucher (i.e., form 1012).  (PSAMF ¶ 56.)  The Postal Service responds that he had received overtime wages for travel time.  (Def.'s Reply Statement ¶ 56.)  Trask conducted an interview of Dobbins on November 5, 2003. (PSAMF ¶ 58; DSMF ¶ 206.)  Dobbins told her that he chose to vacate his seat on August 17, 2003, because he was in the process of passing a kidney stone and he did not feel well enough to take his scheduled flight.  (DSMF ¶ 207.)  This was the first mention Dobbins had made of his

delay being related to a kidney stone.  (Id. ¶ 208.)  During the discussion, Dobbins stated that he felt all of his travel time should be compensated.  (Id. ¶ 212.)

The Postal Service's district finance manager for Maine, Arnold Rosario, had issued a memorandum dated June 9, 2000, which informed postal employees that unauthorized travel would not be reimbursed.  (PSAMF ¶ 86.)  The inference Dobbins would have the Court draw from this is that Trask should simply have addressed the issues of travel wages directly, rather than approving them in order to manufacture a record to fire him.  Dobbins was issued a check for $60.20 in connection with his form 1012 claim, even though it included incorrect dates and the finance manager who approved the claim was aware that the dates were wrong and that other errors were made.  (Id. ¶ 91.)  For example, on his 1012 form Dobbins failed to claim per diems for one day that he was entitled to.  (Id. ¶ 93.)

The Postal Service asserts that Dobbins never informed Trask that he had any "disability."  (DSMF ¶ 211.)  This assertion is based on an EEO affidavit Trask completed for the Postal Service in which she asserted that Dobbins never mentioned "the fact that he had a disability" and "never made an accommodation request regarding a disability."  (Def.'s Ex. 162.)  Trask did understand, however, that Dobbins had sleep apnea and she also understood that Dobbins's sleep apnea was the cause of his FMLA leave.  (PSMF ¶ 211.)  The Postal Service also intimates that Dobbins's other supervisors did not know what medical conditions Dobbins had.  (DSMF ¶ 92.)  However, the record reflects that Garwacki knew Dobbins's FMLA leave requests involved a sleep disorder, something Garwacki acknowledges knowing about as of February 2001.  (PSMF ¶ 92.)

Dobbins had used 12 days of FMLA leave in 2003, as of his October suspension.  (DSMF ¶ 205.)

On November 25, 2003, Trask sent Dobbins a notice of removal severing his employment for unacceptable conduct.  For cause, Trask relied on investigatory findings that (1) Dobbins missed his scheduled flight and accepted a travel voucher from the airline, without prior approval; (2) Dobbins offered Trask a false excuse that his delay in travel had been due to a blackout; and (3) Dobbins filed claims for travel expenses that included incorrect or false statements because he had traveled home early on two occasions.  (Id. ¶ 221; Def.'s Ex. 164.) Dobbins filed a grievance of his termination on December 3, 2003, alleging discrimination. (DSMF ¶ 222.)  The parties arbitrated  the grievance and the arbitrator found for the Postal Service in February 2006.  (Id.)  On December 19, 2003, Dobbins filed a formal complaint with the EEOC claiming disability discrimination and retaliation for EEO and FMLA activity.  (Id. ¶ 228.)  On June 10, 2005, the EEOC denied Dobbins any administrative relief.  (Id. ¶¶ 240-241.) Dobbins also sought unemployment benefits in relation to his termination, without success.  (Id. ¶ 223.)

Dobbins sought a consultation related to his sleep apnea following his termination.  In December 2003, an M.D. specializing in otolaryngology diagnosed "significant sleep apnea," "excessive daytime somnolence," "extreme difficulty staying awake after . . . lunch," and found specific physical causes for the sleep apnea in Dobbins's nose and throat.  (Id. ¶ 226; Def.'s Ex. 172.)  He noted that the condition was first diagnosed in the summer of 2000.  He opined that Dobbins's condition ought to be taken into consideration for all matters relating to Dobbins's work and transportation.  (Id.)  On December 19, 2003, Dobbins filed an EEO complaint claiming that he had been terminated on account of disability and in retaliation for protected EEO activity and for taking FMLA leave.  (Id. ¶ 228.)  Subsequently, in January 2004, another doctor indicated by letter that Dobbins had a history of kidney stones and that the symptoms

15

described by him in relation to the trip to the NTC were consistent with a kidney stone episode. (Id. ¶ 229.)

In January 2004, another doctor indicated that treatment of Dobbins's sleep apnea by means of an "SPSP" machine was improving Dobbins's sleep.  (Id. ¶ 231.)  A different "CPAP" machine was ordered for Dobbins in February 2004.  (Id. ¶ 232.)  Dobbins's otolaryngologist performed sinus surgery on Dobbins in March 2004 in order to improve his "compliance" with the CPAP machine.  (Id. ¶ 233.)  These treatments improved Dobbins's symptoms of sleep apnea but did not cure the disorder.  (Id. ¶¶ 234-236; PSMF ¶¶ 234-236.)  A July 2004 report notes the fact that, without any mechanical treatment, Dobbins "shows a very severe sleep apnea syndrome."  (DSMF ¶ 235; PSMF ¶ 235; Def.'s Ex. 181.)  In 2005, one of Dobbins's consulting physicians opined that Dobbins's "cognitive functions are pretty much intact," but acknowledged the existence of unspecified "major cognitive issues" related to stress, anxiety and sleep apnea. (DSMF ¶ 238; Def.'s Ex. 182.)  Another described Dobbins's cognitive functioning as "within normal range without any significant deficits."  (DSMF ¶ 239; Def.'s Ex. 183.)

Dobbins relies on the testimony of his physician, Dr. Henry Atkins, to establish that he was substantially limited in major life activities.  (See PSAMF ¶¶ 104-113.)  According to Dr. Atkins, Dobbins's sleep apnea, anxiety, depression and adjustment disorder have a "substantial affect on his sleeping and breathing" because they "substantially alter" his ability to sleep and breathe.  (PSAMF ¶ 104; Pl.'s Ex. 51 at 60, 129-30.)  Sleep apnea causes oxygen levels to decrease dramatically because people with sleep apnea sometimes stop breathing while they are asleep.  As a consequence, people with sleep apnea also run a risk of sudden death or arrhythmias.  (PSAMF ¶ 105; Pl.'s Ex. 51 at 61.)  People with sleep apnea do not tend to get restful sleep and are "hypersomnolent," meaning they have trouble waking up in the morning.

(PSAMF ¶ 106; Pl.'s Ex. 51 at 61.)  Dobbins's apnea is based, in part, on airway obstruction from nasal tissue in his palate.  (PSAMF ¶ 107; Pl.'s Ex. 51 at 62.)  According to Dr. Atkins, treatment of sleep apnea with a CPAP machine is difficult for people with anxiety because it involves wearing a mask over the mouth and nose and it keeps about four centimeters of water pressure on the lungs so that complete exhalation is prevented.  (PSAMF ¶ 108.)  Dr. Atkins opines that this is particularly a problem for Dobbins because his array of mental impairments increases his stress.  (Id. ¶ 109.)  In addition to sleep apnea, Dr. Atkins asserts that Dobbins's psychological impairments make it more difficult for him to fall asleep in the first place.  (Id. ¶ 110.)  Thus, stress and anxiety decrease the amount of sleep Dobbins obtains and sleep apnea decreases the quality of that sleep.  Dr. Atkins also opined that the daytime fatigue caused by these conditions have negatively impacted Dobbins's ability to think, respond to problems and behave appropriately.  (Id. ¶ 112.)  In addition, Dr. Atkins believes that there is an obsessive character to Dobbins's personality that combines with his other mental impairments so as to interfere with Dobbins's ability to fill out paperwork.  (Id. ¶ 113.)

In December of 2004, during the pendency of Dobbins's administrative proceedings, the Postal Service addressed a disciplinary matter involving the submission of a false claim for relocation benefits by another postal employee assigned to duty at the Hampden facility.  The Postal Service concluded that this employee made an intentional false representation regarding the age of a son on relocation paperwork in order to obtain an additional $615.28 in relocation benefits.  (Id. ¶ 99.)  The Postal Service proposed removal from service as a disciplinary measure.  (Id. ¶ 100.)  On March 22, 2005, the Postal Service instead imposed a 30-day paper suspension and a requirement to repay the funds.  (Id. ¶ 101; Pl.'s Ex. 50A.)[6]

---

[6]      This statement of the facts leaves a good number of the parties' assertions on the cutting room floor. Among the assertions I have overlooked, those made by the parties in unauthorized reply and sur-reply statements

## Discussion

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002). A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the

---

deserve passing comment. Pursuant to Local Rule 56(d), a summary judgment movant replying to an opposing statement of material facts shall limit its reply statement to only those additional statements offered by the non-movant in its opposing statement. Here, the Postal Service disregarded the Rule by offering in excess of 30 statements replying to Dobbins's response to the Postal Service's own statements. That is not authorized by the Rule except in order to address a request to strike an individual statement. D. Me. Loc. R. 56(e). I have disregarded these replies *sua sponte*. Compounding its rule violation, the Postal Service also offered its own statement of additional material facts following its response to Dobbins's statement of additional material facts. Predictably, this maneuver prompted Dobbins to file a sur-reply statement requesting that the Court strike the Postal Service's additional statement. That request is entirely appropriate and I have sustained it with respect to my own review of the record. In the sur-reply, Dobbins also attempts to address challenges to the quality of the evidence he cited in support of his additional statements 39 and 97. The sur-reply is unauthorized in this respect and I have disregarded it. This aspect of the sur-reply is addressed to the all-too-familiar squabble that arises when one attorney cites an exhibit produced in discovery without also citing some associated deposition testimony or affidavit that serves to authenticate the exhibit in question, and the other party's attorney (who is usually guilty of the same offense) seeks to confound his or her colleague with a combination hearsay/authenticity objection. Considering the many, many presentations given by the bench and the bar on summary judgment practice, it occurs to me that altogether too few practitioners observe the basic practice of citing authenticating testimony (which could be counsel's own summary judgment affidavit, attached to the electronic document as "exhibit 1") in support of exhibits that are critical to the matter at hand. In any event, in this case the sur-reply effort to present counsel's authenticating affidavit is not critical to the case. The fact offered in additional statement 39 concerns what is purported to be a contemporaneous note of a telephone call Trask had on August 19, not the far more significant note Trask took in connection with the call she had on August 18 that is authenticated by a citation to Trask's deposition testimony. The August 19 note amounts to cumulative evidence concerning the postal inspector's opinion of Dobbins's transgressions. The fact offered in additional statement 97 concerns what is purported to be a memorandum sent to Trask attaching a form she needed to fill out in regard to Dobbins's termination. The portion of the memorandum that is called to the Court's attention does not support the inference that Dobbins wants it to support, so this controversy, too, is much ado about nothing.

facts without resort to speculation. <u>Merchants Ins. Co. v. United States Fid. & Guar. Co.</u>, 143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. <u>ATC Realty, LLC v. Town of Kingston</u>, 303 F.3d 91, 94 (1st Cir. 2002).

The Postal Service challenges all counts of Dobbins's civil action. Its foremost argument is that Dobbins cannot establish the existence of a disability that substantially limits him in a major life activity. (Def.'s Mot. Summ. J. at 5-12, Docket No. 39.) Next, the Postal Service argues that Dobbins had no record of disability and was not perceived as disabled by his supervisors. (<u>Id.</u> at 12-13.) As for any claims alleging failure to accommodate, the Postal Service argues that liability cannot have arisen because Dobbins never requested any accommodation and also because "[e]mployers do not have to tolerate misconduct as an accommodation of a disability." (<u>Id.</u> at 13-15.) With respect to retaliation for activity protected under federal law, the Postal Service maintains that there is insufficient evidence of a causal connection between such activity and his termination. (<u>Id.</u> at 15-18.) Finally, the Postal Service contends that Dobbins's summary judgment presentation is not capable of supporting a finding that the Postal Service's justifications for his termination are merely pretexts for discrimination. (<u>Id.</u> at 18-20.) I address each of these arguments in turn, with the exception of the failure to accommodate argument. Dobbins does not press a claim for failure to accommodate.

## A.     Disability Discrimination

As a United States Postal Service employee, Dobbins's disability discrimination claim proceeds under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq*., rather than the Americans with Disabilities Act, though the same legal standards apply to his claim. <u>Quiles v. Henderson</u>, 439 F.3d 1, 4 (1st Cir. 2006). The Rehabilitation Act provides:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).  As with a claim brought under the Americans with Disabilities Act, a Rehabilitation Act claimant alleging disability discrimination must establish three things to prevail:  "(1) that he was disabled, (2) that despite his disability, he was able to perform the essential functions of the job, either with or without reasonable accommodation, and (3) that his employer discharged him because of that disability."  Rivera v. Danzig, 234 F.3d 790, 795 (1st Cir. 2000).  The Postal Service's motion addresses only the first and third elements of the claim.

> ### 1.      There is a genuine issue of material fact whether Dobbins's impairments substantially limited his ability to sleep.

In order to qualify for protection under the Rehabilitation Act, a person must fall into one or more of three categories set forth in section 12102 of the ADA:

> The term "disability" means, with respect to an individual—

> (A)  a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

> (B)  a record of such an impairment;  or

> (C)  being regarded as having such an impairment.

42 U.S.C. § 12102(2).  As for the first category, a person is not disabled unless he or she has (1) a physical or mental impairment that (2) substantially limits (3) a major life activity.  Id.; see also Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002) (holding that "an individual must have an impairment that prevents or severely restricts the individual from doing activities

that are of central importance to most people's daily lives").  Although the Postal Service does not contend that Dobbins's conditions are not impairments, it does contend that Dobbins's physical and mental impairments do not substantially limit a major life activity.  (Def.'s Mot. Summ. J. at 7-10.)  Dobbins responds that his mental and physical impairments substantially limit his ability to breath and sleep.  (Pl.'s Opp'n Mem. at 11, Docket No. 46.)  I consider the activity of breathing while sleeping to be a component of the activity of sleeping because it describes a physical impairment that limits Dobbins's ability to obtain restful sleep.

It is Dobbins's burden to establish, in an individualized fashion, the degree of limitation he suffers with respect to his ability to sleep.  See id. at 199. With respect to this activity, the statements of material facts offered by Dobbins in response to the Postal Service's summary judgment motion should divulge the particulars as to conditions under which he sleeps, so that there might be some factual content from which the factfinder could undertake a reasoned evaluation of how Dobbins's ability to sleep relates to the norm.  29 C.F.R. § 1630.2(j); Harding v. Cianbro Corp., 436 F. Supp. 2d 153, 175-76 (D. Me. 2006) (Woodcock, J.) (finding a substantial limitation in the plaintiff's ability to sleep).  Dobbins must demonstrate a qualifying disability by demonstrating that he is "significantly restricted as to the condition, manner, or duration under which [he] can [sleep] as compared to the condition, manner, or duration under which the average person in the general population can [sleep]."  29 C.F.R. § 1630.2(j)(1); Wright v. CompUSA, Inc., 352 F.3d 472, 476 (1st Cir. 2003).

The evidence in this case permits a finding that Dobbins loses sleep due to mental impairments and experiences a poorer quality of sleep due to a physical impairment that obstructs his airway when he sleeps.  Although the precise quantity of sleep that Dobbins obtains on average is not indicated, the evidence permits a finding that Dobbins's sleep is "significantly

restricted" because he faces an elevated risk of sudden death or arrhythmias due to oxygen deprivation while sleeping, experiences hypersomnolence in the morning that frustrates normal waking, experiences fatigue throughout the day, and experiences some diminishment in his cognitive faculties due to his fatigue.  Taken in combination, I conclude that these facts could support a finding that Dobbins suffered a "significant restriction" in regard to the "condition" and "manner" of Dobbins's sleep, even though the evidence could not support a finding that Dobbins was substantially limited in his ability to pursue other life activities such as working, thinking or behaving appropriately in the social contexts.  The only hesitation I have in drawing this conclusion is that the evidence Dobbins cites does not permit a neat quantitative correlation between his experience of sleep and any standard of sleep observed by the so-called average person.  For instance, in Harding, the Court based its ruling on the substantial limitation question on evidence that compared the plaintiff's sleep to data presented in a sleep survey published in the *Washington Post*.  436 F. Supp. 2d at 176-76.  Somewhat similarly, but with the opposite result, I ruled in Pouliot v. Town of Fairfield, 226 F. Supp. 2d 233 (D. Me. 2002), that a plaintiff asserting a substantial limitation in regard to sleep fell short of his burden because he established only vague, generic sleep problems such as might be experienced by a broad cross-section of the population, without differentiating his experience from that of the average person.  Id. at 243-44. There is little or no appreciable discussion in this record about the so-called average person. However, I conclude that the evidence is sufficient to demonstrate a significant departure with respect to the quality of sleep that is attained, because Dobbins has gone beyond generalities to document cognitive symptoms, an impact on his ability to wake in the morning, a need to sleep during the day, and, more significantly, a qualitative departure from normal sleep due to oxygen deprivation that elevates his risk of death from oxygen starvation to some degree, albeit an

unspecified degree.  Although the degree of risk of death is not indicated, I find it difficult to conclude that any such increase would not be regarded as significant to the average person.  Nor can I fairly conclude that an average person would regard hypersomnolence due to oxygen deprivation (as opposed to the typical tiredness many feel upon waking) and a need to sleep during the day to be insignificant conditions.  Based on this presentation, I feel that it would be an unwarranted tightening of the governing standard to grant summary judgment based upon the absence of a specific description of what the average person experiences when it comes to sleep, however widespread sleep deprivation may be as an impairment.  Parenthetically, it does not appear to be the law that a plaintiff must establish, in all cases, the precise measure of an average person's ability to engage in the life activity at issue, only that the plaintiff is substantially limited or significantly restricted in his or her ability to engage in the activity.  In this case, in particular, it would seem that common sense and experience could supply the necessary information concerning the average person's experience.

As for Dobbins's present symptoms, the Postal Service argues that corrective measures put in place subsequent to his termination have laid to rest the question of whether Dobbins is substantially limited.  Amenability to treatment is a factor relevant to an individualized inquiry concerning the existence of a qualifying disability.  Sutton v. United Air Lines, 527 U.S. 471, 481-83 (1999).  The reports that are cited by the Postal Service indicate that the corrective measures prescribed by Dobbins's doctors have improved Dobbins's symptoms.  Although there is a suggestion by Dr. Atkins that Dobbins finds it stressful or difficult to use the machines that treat sleep apnea, he does not opine that Dobbins cannot use the machines and the record otherwise indicates that Dobbins has made use of the machines to treat his sleep apnea.  This evidence demonstrates that Dobbins is not disabled by his sleep apnea as of this date.  However,

there remains a legal question whether the corrective measures analysis required by Sutton gives

courts license to dismiss disability discrimination cases based on a plaintiff's treatment plan as of

the date of litigation, even if that treatment plan was not in place as of the date the employer took

the challenged adverse employment action. My opinion is that the existence of a qualifying

disability should be determined based on an individualized assessment of the plaintiff's

limitations at or around the time of the adverse employment action.

In Sutton, the Supreme Court held "that the determination of whether an individual is

disabled should be made with reference to measures that mitigate the individual's impairment."

527 U.S. at 475. Based on this holding, the Court affirmed the dismissal of a disability

discrimination action for failure to state a claim where the plaintiffs—unsuccessful applicants for

commercial pilot positions—suffered from severe myopia but attained 20/20 vision with the aid

of corrective lenses. Id. at 475-76. Visual acuity of 20/100 or better was a minimum

requirement for the job. Id. at 476. In the body of its opinion, the Court reasoned:

> Looking at the Act as a whole, it is apparent that *if* a person is taking measures to
> correct for, or mitigate, a physical or mental impairment, the effects of those
> measures—both positive and negative—must be taken into account when judging
> whether that person is "substantially limited" in a major life activity and thus
> "disabled" under the Act.

Id. at 482 (emphasis added). In this case, unlike in Sutton, the plaintiff was not taking

measures to mitigate his sleep-related impairments at the time of the alleged

discriminatory termination. The plaintiff only sought out treatment in the wake of his

termination.

According to the Supreme Court, because section 12102(2)(A) defines disability

in the "present indicative verb form," the law must require that the plaintiff be

"presently—not potentially or hypothetically—substantially limited in order to

demonstrate a disability."  Id.  Of course, the Rehabilitation Act, like the ADA, is designed to prevent employment discrimination against those who are substantially limited in a major life activity by virtue of a mental or physical impairment.  The Acts make it unlawful for certain employers to discriminate in employment on the basis of disability.  Because the onus of the law is placed on the employer, it is more appropriate, in my view, to treat the "present" state of affairs, for purposes of judging the disability question, as the window in time during which the plaintiff's limitation was material to the adverse employment action in question.  Within that window of time rests the "present" state of affairs between the parties that is material to determining the existence of discrimination as well as the "present" instant in which the claim of discrimination accrued.  The fact that a subsequent corrective measure makes it possible for an impaired individual to engage in a major life activity to an extent comparable to the average person does not erase the fact that he was substantially limited at the time of the adverse employment action and that the substantial limitation in question was a material cause of the adverse employment action.  Nor, in my view, should it be relied upon to deprive a litigant of rights and remedies that accrued on the date of the alleged discrimination.  As with other cases, factfinders should determine the existence of liability based on the circumstances that gave rise to the cause of action.  A contrary rule would disregard the congressional effort to redress discrimination.  It would also create a disincentive for individuals suffering from substantial limitations to seek out treatment following a discriminatory event in the workplace.

Unfortunately, I have been unable to locate any persuasive authority to offer the Court on this question and the parties have not provided the Court with any.  The Postal

Service maintains that one of its authorities supports a contrary rule, but my reading of that case indicates that it offers no guidance on the question.  In Green v. Acme Markets, Inc., the United States District Court for the Eastern District of Pennsylvania granted an employer's motion for summary judgment in an employment discrimination case for failure to demonstrate an adverse employment action.  No. 05-3427, 2006 WL 1451335, *1, 2006 U.S. Dist. LEXIS 32916, *3 (E.D. Pa. May 24, 2006).  In addition, the court found that it "need not decide whether sleep apnea can qualify as a disabling condition because Plaintiff did not begin treatment for his condition until about or after he resigned."  Id.  I am not sure what the court was getting at with the latter finding, but it does not actually address the question of whether subsequent corrective measures should bar disability claims from going forward.  All but one of the other cases cited by the Postal Service involve corrective measures that were employed at the time of the adverse employment measures.  See Reidman v. John Hewitt & Assocs., No. 00-CV-251-P-H, 2001 WL 506864, *16, 2001 U.S. Dist. LEXIS 6367, *52 (D. Me. May 15, 2001);  Cox v. U.S. Dep't of Navy, No. 3:02-CV-467-S, 2005 WL 3050495, *4, 2005 U.S. Dist. LEXIS 27961, *12-*13 (W.D. Ky. Nov. 10, 2005);  Wendt v. Evergreen Park, No. 00-C-7730, 2003 WL 223443, *3, 2003 U.S. Dist. LEXIS 1463, *7-*8 (N.D. Ill. Jan. 31, 2003).  The final case, Tangires v. Johns Hopkins Hospital, occupies something of a middle ground.  There, the plaintiff's doctors testified that her asthma was entirely treatable, that they had in fact attempted to treat the plaintiff's asthma during the period of her employment difficulties, and that the plaintiff adamantly refused to take the steroid drugs they routinely prescribed to control asthma.  79 F. Supp. 2d 587, 595-96 (D. Md. 2000).  Under those circumstances, the court found that the plaintiff did not qualify as

disabled because her asthma was treatable and she had "intentionally failed to follow her physicians' recommendations that she take steroid medication."  Id. at 596.  That record supported a finding that, as of the date of the alleged discriminatory act, the plaintiff's doctors had not only prescribed a course of treatment, but one that would have fully treated the plaintiff's asthma symptoms and prevented her from experiencing substantial limitation in her ability to breathe.  The summary judgment record in this case does not afford a sound basis for making comparable findings.  We know that sleep apnea was diagnosed around the year 2000, but we do not know what, if any, treatment was prescribed.

Because I conclude that Sutton does not make it appropriate for courts to foreclose disability discrimination claims when post-discrimination treatment alleviates a substantially limiting impairment, I have not relied on the evidence of Dobbins's post-termination surgery and use of breathing apparatus to determine whether or not he qualifies to pursue a disability claim under the Rehabilitation Act.  In this case, the Postal Service terminated Dobbins before he obtained the treatment that improves his ability to breathe while sleeping.  I therefore conclude that Dobbins presents enough to generate a genuine issue of material fact whether he was disabled at the time of his termination and that this showing suffices to satisfy his *prima facie* burden.

### 2.   *There is a genuine issue of material fact whether the Postal Service discharged Dobbins because of his disability.*

In section VII of its summary judgment motion, the Postal Service asserts that Dobbins "cannot prove that his travel fraud was pretext for unlawful discrimination."  (Def.'s Mot. Summ. J. at 18.)  According to the Postal Service, "there is no genuine issue that [Dobbins] tried to defraud his employer with respect to his travel time and expenses," and, therefore, its assertion of

27

fraud as the cause of the termination cannot fairly be regarded as pretext.  (Id.)  The record

demonstrates that Trask understood Dobbins's sleep impairment to be the cause of his FMLA

leave requests.  Dobbins took three consecutive days of FMLA leave prior to attending training

at the NTC.  Within days he was under investigation.  Within two or three weeks of his return to

his regular duty station, Trask suspended him on the basis that, according to her, she believed he

was perpetrating a fraud on the Postal Service in regard to his travel compensation.  One

component of that charge concerned, exclusively, the submission of erroneous dates that were

readily rectified and, according to Dobbins, were innocent mistakes that were of a kind

customarily overlooked or else unilaterally amended by the financial auditors who review travel

vouchers.  The other component concerned travel time and that component was, arguably,

advanced by Trask herself, who approved rather than denied a claim for extra travel time on

August 18 and then, having approved it, commenced a criminal investigation against Dobbins.

These are curious facts that are hard to evaluate on a paper record.  Whether the extended travel

time arose on account of a medical need, as Dobbins asserts, or on account of fraud, as the Postal

Service contends, is itself a genuine issue of material fact.  Moreover, in conjunction with these

managerial acts, Trask took a note of her telephone discussion with Dobbins in which, one might

reasonably conclude, she referenced Dobbins's EEO status when there was no apparent reason

for her to do so.  On that same date, she conferred with Hanscom, another of Dobbins's

supervisors, who complained that Dobbins was a difficult employee and who gave Trask an EEO

file concerning Dobbins.  It would not be utterly unreasonable for a factfinder to conclude that

the file was passed along on or around that same date, though Trask says otherwise.  Finally, the

record includes evidence of disparate treatment in regard to the punishment meted out to

Dobbins for his travel-related transgressions.  He was sacked for his conduct, while another

employee received a 30-day "paper" suspension.  It would appear that the value of the false claim at issue in the other person's disciplinary matter exceeded the amount at issue in Dobbins's matter.  Taking all of these circumstances together, I conclude that a factfinder might reasonably find that Dobbins's disabled status and the managerial problems that arose on account of it were the material factor in the Postal Service's determination to terminate Dobbins's employment.  The Postal Service argues, appropriately, that there is no reason it "should be required to tolerate such behavior in an employee."  (Def.'s Mot. Summ. J. at 20.)  Even assuming that Dobbins did attempt to defraud the Postal Service, the problem with this argument is that the Postal Service suffered like conduct in another employee without imposing the ultimate penalty of termination.  That conduct occurred while Dobbins's claims were still in the administrative process and it involved an employee who worked in the same Hampden facility as Dobbins.  There is no suggestion that a past disciplinary record was a material factor for either employee.  There is a strong suggestion that a past history of contention over Dobbins's disability-related claims was material to his termination.  Dobbins was terminated and the other employee was not.  Coupled with the other circumstantial evidence, a reasonable factfinder could infer discriminatory intent from this record.

**B.      EEO Activity Retaliation**

In his second count, Dobbins alleges that he was retaliated against for the EEO activity that was settled in March of 2003 and for a complaint he made sometime thereafter about a violation of work place standards promulgated by the Occupational Safety and Health Administration under the Occupational Safety and Health Act.  (First Am. Compl. ¶¶ 34-39.)  At best, the "OSHA complaint" is relevant evidence that can be considered in the context of a pretext analysis, but there is no private right of action under OSHA to redress retaliation.  Elliot

v. S.D. Warren & Co., 134 F.3d 1, 5 (1st Cir. 1998); Taylor v. Brighton Corp., 616 F.2d 256,

262-63 (6th Cir. 1980) (holding that OSHA does not afford a private right of action to redress

retaliatory discrimination).  The Postal Service challenges the EEO retaliation claim on the

ground that the temporal connection between the March 2003 settlement and the October 2003

suspension is too attenuated to support an inference of a causal connection.  (Def.'s Mot. Summ.

J. at 16.)  A period of seven months is not sufficient, in itself, to establish causation.  On the

other hand, it is not a long enough period to rule out an inference of retaliation.  In any event,

timing is not the only circumstantial evidence of causation that is available in this record.  When

it is considered in connection with the EEO notation that Trask made, the exchange of EEO

materials between Hanscom and Trask, and the disparate disciplinary treatment meted out on

Dobbins, the circumstances become sufficient to permit an inference of retaliatory purpose.


C.      **FMLA Retaliation**

        The analysis of this final claim follows essentially the same pattern as the analysis of the

foregoing claims.  Dobbins claimed three days of FMLA leave immediately prior to attending

training at the NTC.  Within days Trask commenced a criminal investigation against Dobbins for

making what she considered to be an unjustified claim for travel pay that she might simply have

denied, instead.  An inference could be drawn that during the course of the initial investigation,

Trask made note of Dobbins's EEO background, which concerned, among other things, the same

medical conditions that Dobbins cited in support of his FMLA leave requests.  Upon launching

her investigation, Trask also consulted with Hanscom, a supervisor in charge of scheduling, who

described Dobbins, a frequent applicant for FMLA leave, as "difficult."  An inference could be

drawn that Hanscom promptly provided Trask with a copy of a Dobbins EEO file in order to

explain the basis for his unfavorable opinion.  It is undisputed that Dobbins's mental and physical impairments contributed to both his EEO activity and his FMLA leave requests.  The tangled nature of the circumstances surrounding Dobbins's assertion of these rights could, therefore, support an inference of discriminatory purpose stemming from either activity or both activities. The Postal Service characterizes such inferences as absurd (Def.'s Mot. Summ. J. at 18) because it routinely approved Dobbins's requests for FMLA leave.  However, this is but one factor to consider and it does not override the other circumstances.  The Postal Service has acknowledged that neither Trask nor Garwacki believed Dobbins was truthful about his need for FMLA leave prior to his departure for training in August 2003 and the record indicates that the question of whether Dobbins was entitled to FMLA leave for his impairments was not a matter over which his supervisors had any control.  Thus, the fact that one administrative office within the Postal Service granted Dobbins's application for unscheduled, intermittent leave does not warrant an inference that his immediate supervisors could not have harbored animosity over the fact that he took such leave.  Indeed, evidence cited by the Postal Service could support a finding that the uncertainty experienced by Dobbins's local supervisors over Dobbins's FMLA leave was a source of appreciable frustration for them.  (Def.'s Ex. 81 at 2, fourth and tenth bullets (Lorraine Martin describing Hanscom's concern that Dobbins was "taking a lot of time off," Hanscom's desire to know what he could do about it and the fact that Hanscom made numerous phone calls to her about it), cited in PSMF ¶ 91; Def.'s Ex. 84 (reflecting Garwacki's view in December 1999 that Dobbins had "banged" him for 12 FMLA absences, which "are now affecting my operation"), cited in DSMF ¶ 92; Def.'s Ex. 83, cited in DSMF ¶ 91.)  It also appears that Dobbins's entire management team got involved in the matter, even though the final disciplinary determination was issued by Trask.  (Def.'s Ex. 16 at 59-60 (indicating that Trask sought

Garwacki's approval before suspending Dobbins), cited in DSMF ¶¶ 204; see also PSAMF ¶¶ 29-30 (concerning Hanscom's provision of his Dobbins EEO file to Trask).

## Conclusion

The more than 350 statements of material fact offered by the parties in conjunction with the pending summary judgment motion certainly provide ample grist to support factual findings unfavorable to Mr. Dobbins's claims.[7]  However, the task at hand requires the Court to construe the record in the light most favorable to Dobbins and to draw inferences in his favor as well. When the record is viewed in that manner, it simply cannot be said that no reasonable person could fairly arrive at the conclusion that Dobbins suffered the ultimate sanction of termination, not because he posed an unacceptable threat to the security of postal funds or the mails, but because he was considered a troublesome employee on account of his prolonged and zealous exercise of his EEO and FMLA rights, which he pursued on account of impairments that could

---

[7]       The Postal Service argues that the Court "can and should consider the decision of the arbitration panel . . . as evidence supporting the Postal Service's contention that it had a legitimate non-discriminatory basis for terminating Dobbins and that the basis was not merely a pretext." (Mot. Summ. J. at 19 n.6.)  In support of this proposition, the Postal Service cites Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 (1974), where it was observed that an arbitral decision "may be admitted as evidence and accorded such weight as the court deems appropriate."  The language immediately preceding this statement, however, reads as follows:

> [T]he federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII.  The federal court should consider the employee's claim de novo.

Id. at 59-60.  See also Wright v. Universal Mar. Serv. Corp., 525 U.S. 70, 75-76 (1998) (discussing Gardner-Denver's tension with another line of Supreme Court cases).  At this juncture, the standard that applies to Rule 56 of the Federal Rules of Civil Procedure requires the Court to construe the record in the light most favorable to Mr. Dobbins, so the suggestion that the Court weigh the arbitration decision is problematic, to say the least. Additionally, the Postal Service's invitation to foreclose trial de novo is anything but adequately briefed with a solitary citation to Alexander.  Not only is it not adequately briefed, but in over 240 statements of fact, the Postal Service has not even indicated that the parties agreed to arbitrate claims arising under the Rehabilitation Act or the FMLA.  The arbitrator's decision appears to be a standard review of the Postal Service's "just cause" determination. (Def.'s Ex. 166.)  As for his determination that there was just cause for termination, I do not take issue with the finding that the circumstances surrounding Dobbins's travels in August and September 2003 are sufficient to support a finding of fraudulent intent and that such conduct could justify termination rather than a lesser form of discipline. Nevertheless, the instant motion calls for the Court to decide if a genuine issue of fact exists whether the decision to terminate Dobbins was motivated by discriminatory and/or retaliatory animus.  The arbitrator's decision does not foreclose such a finding.

reasonably be regarded as having substantially limited his ability to sleep.  Accordingly, I

conclude that genuine issues of material fact exist for trial and RECOMMEND that the Court

DENY the Postal Service's motion for summary judgment (Docket No. 39).)

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  January 29, 2007